WO                                                                                          MGD

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF ARIZONA**

Edward Lee Jones, Jr.,                                No.   CV 18-01972-PHX-MTL (JZB)

                    Plaintiff,

v.                                                            **ORDER**

Charles L. Ryan, et al.,

                    Defendants.

        Plaintiff Edward Lee Jones, Jr., who is currently confined in Arizona State Prison Complex (ASPC)-Eyman, Special Management Unit (SMU) I, brought this pro se civil rights action pursuant to 42 U.S.C. § 1983 and the Religious Land Use and Institutionalized Persons Act ("RLUIPA").  (Doc. 64.)  Pending before the Court is Defendants Shinn, McWilliams, Diaz, Slade, Olson, Reese, Miller, and Lauchner's Motion for Summary Judgment (Doc. 121), which Defendant Mattson joins (Doc. 136).  The Court provided notice to Plaintiff pursuant to *Rand v. Rowland*, 154 F.3d 952, 962 (9th Cir. 1998) (en banc), regarding the requirements of a response to the Motion (Doc. 123), and Plaintiff opposes the Motion.  (Docs. 128–131).

        The Court will grant the Motion and terminate this action.

**I.      Background**

        Plaintiff alleges in his First Amended Complaint (FAC) that he is a true believer of the Islamic faith and that reading Islamic literature is compelled by Islam and is part of the way Plaintiff practices and expresses his religious beliefs.  (Doc. 64 at 5, 8.)  In furtherance

of his practice, in 2018, Plaintiff ordered five Islamic-centered books, but Arizona Department of Corrections (ADC) Department Order (DO) 914 resulted in the books being classified as contraband, and Plaintiff did not receive the books. (*Id.* at 6.) Labelling these items as contraband prevented Plaintiff from reading his Islamic literature during Ramadan and rendered his "religious exercise . . . impracticable." (*Id.* at 8.) Plaintiff alleges that, as a result of the policy and the exclusion of the books, Defendants violated his First Amendment rights to free speech and free exercise of religion, his rights under RLUIPA, and his Fourteenth Amendment due process rights. (Doc. 64.) Plaintiff seeks damages, declaratory and injunctive relief. (*Id.* at 27.)

On screening of Plaintiff's FAC pursuant to 28 U.S.C. § 1915A(a), the Court determined that Plaintiff stated First Amendment free speech, First Amendment free exercise, and RLUIPA claims in Counts 1 through 8 and Fourteenth Amendment due process claims in Counts 4, 5, 6, and 8. (Docs. 18, 63.)[1] The Court directed the following Defendants to answer the FAC in their official and/or individual capacities: ADC Director Ryan (Count 1 in his official capacity)[2]; ADC Division Director of Support Services McWilliams (Count 2 in his individual and official capacities); and ADC Deputy Director Lauchner (Count 3 in his individual and official capacities). (Doc. 63.) The Court required the following Defendants to answer the FAC in their individual capacities: Property Officer Slade (Count 4); Office of Publication Review (OPR) employees Olson (Count 5), Reese (Count 6), and Miller (Count 7); and Property Sergeant Mattson (Count 8). (*Id.*)

In an Order dated June 18, 2019, the Court granted Defendants McWilliams, Slade, Olson and Reese's Motion to Dismiss the individual-capacity RLUIPA claims against them in Counts 2, 4, 5, and 6. (Doc. 78.) The Court determined that existing Ninth Circuit law

---

[1] Because Counts 1 through 6 and 8 in Plaintiff's FAC were identical to those same Counts in Plaintiff's original Complaint, the Court, while screening the FAC, adopted the analysis of the prior screening Order for those Counts. (Doc. 63 at 4.)

[2] On December 19, 2019, the Court substituted current ADC Director David Shinn for Ryan in his official capacity and dismissed Ryan from this action. (Doc. 113.)

did not authorize RLUIPA suits for damages against state officials in their individual capacities.  (*Id*. at 4.)  For the same reason, the Court subsequently granted Mattson's Motion to Dismiss the individual-capacity RLUIPA claim against him in Count 8. (Doc. 138.)

Although Defendants never moved for dismissal of the individual-capacity RLUIPA claims against Lauchner (Count 3) and Miller (Count 7) prior to now, the Court will dismiss those claims for the same reason it dismissed the RLUIPA claims against the above Defendants because they are against similarly situated Defendants.  *See Abagninin v. AMVAC Chem. Corp.*, 545 F.3d 733, 742-43 (9th Cir. 2008) ("A [d]istrict [c]ourt may properly on its own motion dismiss an action as to defendants who have not moved to dismiss where such defendants are in a position similar to that of moving defendants.") (quoting *Silverton v. Dep't of Treasury*, 644 F.2d 1341, 1345 (9th Cir. 1981)).

**II.     Summary Judgment Standard**

A court must grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).  The movant bears the initial responsibility of presenting the basis for its motion and identifying those portions of the record, together with affidavits, if any, that it believes demonstrate the absence of a genuine issue of material fact.  *Celotex*, 477 U.S. at 323.

If the movant fails to carry its initial burden of production, the nonmovant need not produce anything.  *Nissan Fire & Marine Ins. Co., Ltd. v. Fritz Co., Inc.*, 210 F.3d 1099, 1102-03 (9th Cir. 2000).  But if the movant meets its initial responsibility, the burden shifts to the nonmovant to demonstrate the existence of a factual dispute and that the fact in contention is material, i.e., a fact that might affect the outcome of the suit under the governing law, and that the dispute is genuine, i.e., the evidence is such that a reasonable jury could return a verdict for the nonmovant.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 250 (1986); *see Triton Energy Corp. v. Square D. Co.*, 68 F.3d 1216, 1221 (9th Cir. 1995).  The nonmovant need not establish a material issue of fact conclusively in its

favor, *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 288-89 (1968); however, it must "come forward with specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co.*, *Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (internal citation omitted); *see* Fed. R. Civ. P. 56(c)(1).

At summary judgment, the judge's function is not to weigh the evidence and determine the truth but to determine whether there is a genuine issue for trial. *Anderson*, 477 U.S. at 249. In its analysis, the court must believe the nonmovant's evidence and draw all inferences in the nonmovant's favor. *Id.* at 255. The court need consider only the cited materials, but it may consider any other materials in the record. Fed. R. Civ. P. 56(c)(3).

## III.     Procedural Issue

In their Reply, Defendants argue that Plaintiff's Response fails to comply with Local Rule of Civil Procedure 56.1 and, therefore, the Court should deem Defendants' Statement of Facts admitted. (Doc. 137 at 1–3.) Defendants further argue that Plaintiff presents facts without foundation or competent evidence. (*Id.* at 3.)

The Court will deny Defendants' request to deem their facts admitted. Because Plaintiff is proceeding pro se, the Court must avoid applying summary judgment rules strictly. *Thomas v. Ponder*, 611 F.3d 1144, 1150 (9th Cir. 2010) (courts must "construe liberally motions papers and pleadings filed by pro se inmates and . . . avoid applying summary judgment rules strictly"). Although Plaintiff does not make clear in his Statement of Disputed Facts (Doc. 129) what he is actually disputing or properly cite to supporting evidence, Plaintiff's position is sufficiently clear in his Statement of Facts, Declaration, and other record evidence, including his FAC. *See Jones v. Blanas*, 393 F.3d 918, 923 (9th Cir. 2004) (allegations in a pro se plaintiff's verified pleadings must be considered as evidence in opposition to summary judgment); *Schroeder v. McDonald*, 55 F.3d 454, 460 (9th Cir. 1995) (verified complaint may be used as an affidavit opposing summary judgment if it is based on personal knowledge and sets forth specific facts admissible in evidence). Moreover, when considering the nonmovant's opposition to summary judgment, courts do not focus on the admissibility of the evidence's form; rather, the focus

is on the admissibility of its contents.  *Celotex*, 477 U.S. at 324; *Fraser v. Goodale*, 342 F.3d 1032, 1036 (9th Cir. 2003).  Thus, where the nonmovant's statements are based on personal knowledge and could be presented in a form admissible at trial (e.g., through testimony), a court can consider such statements.  *Fraser*, 342 F.3d at 1036-37.

## IV.   Relevant Facts

Plaintiff has been in the custody of the ADC since 2008 and is currently classified as maximum custody.  (Doc. 122 (Defs.' Statement of Facts) ¶¶ 1, 2.)  Plaintiff is a follower of the Nation of Islam and practices the teachings of Elijah Muhammad, who was the last prophet of Allah, and Minister Louis Farrakhan, who, along with Elijah Muhammad, is a leader of the Nation of Islam.  (Doc. 128 (Pl. Decl.) at 2 ¶¶ 3, 4.)  The texts and literature by Elijah Muhammad and Louis Farrakhan are essential religious texts needed to practice the Islamic faith in accordance with the Nation of Islam.  (*Id.* ¶ 6.)

DO 914 sets forth the procedure for receipt, screening, and delivery of mail at ADC.  (Doc. 122-1 at 22-44.)  DO 914.07 provides that "[i]n order to assist with rehabilitation and treatment objectives, reduce sexual harassment and prevent a hostile environment for inmates, staff and volunteers, inmates are not permitted to send, receive or possess sexually explicit material or content that is detrimental to the safe, secure, and orderly operation of the facility as set forth in this Department Order."  (*Id.* at 36.)  As relevant in this action, "[p]rohibited publications include but are not limited to: . . . [c]ontent that is oriented toward and/or promotes racism and/or religious oppression and the superiority of one race/religion/political group over another, and/or the degradation of one race/religion/political group by another."  (*Id.* at 37 (DO 914.07 § 1.2.8).)

Publications sent to prisoners are reviewed by trained facility complex mailroom staff to ensure they do not threaten the safety, security, and order of the prison.  (Doc. 122 ¶ 5.)  In conducting their review, mailroom staff first check the Publications Review Database (PRD), a statewide database that contains information about excluded or permitted publications.  (*Id.* ¶ 6.)  Publications that have been excluded previously are not allowed if subsequently ordered by a prisoner; likewise, publications that have been

allowed previously continue to be allowed if subsequently ordered.  (*Id*.)  If a publication has been previously excluded, mailroom staff responsible for enforcing DO 914 will "contraband" the publication and exclude it.  (*Id.* ¶ 7.)  If a publication is not in the PRD, staff review it for compliance with DO 914; publications with unauthorized content will be prohibited.  (*Id.* ¶¶ 5, 9.)  If a publication is excluded, complex mailroom staff send the prisoner a Notice of Result, informing the prisoner of the decision and that the prisoner has 30 days to submit an appeal to the Office of Publication Review (OPR).  (Doc. 122-1 at 38 (DO 914.08 § 1.2.)  If a prisoner appeals a publication decision, the OPR may allow the publication by redacting unauthorized content, allowing the publication in its entirety, or upholding the exclusion of the publication in its entirety.  (*Id*. at 39 (DO 914.08 § 1.2.2.4).)  Appeal decisions by the OPR are final and exhaust a prisoner's administrative remedies.  (*Id*. (DO 914.08 § 1.2.2.5).)  Previous second-level decisions by OPR to exclude publications remain final and a prisoner may not re-submit those excluded publications for review or appeal.  (Doc. 122-1 at 15-16 ¶ 44.)

Racial tension and violence are problems in the ADC system as well as in prisons across America.  (Doc. 122 ¶ 17.)  "Security Threat Groups often collate in racial groups" and prison riots "most often stem from racial tension or [are] fueled by racism."  (*Id.* ¶ 18.)  The Nation of Islam, however, is not on the ADC's Security Threat Group list.  (Doc. 128 at 6 ¶ 24.)  Perceptions of racism or beliefs of racial superiority can lead to violence and disorder.  (Doc. 122 ¶ 19.)  ADC has an Integrated Housing Program in which it strives to achieve racial integration in cells and dorms and to combat racial segregation, which can be detrimental to ADC's rehabilitation goals.  (*Id.* ¶ 20.)

Prior to 2018, Plaintiff was able to obtain Nation of Islam reading material from other prisoners to study throughout the year and during the holy month of Ramadan.  (Doc. 128 at 3 ¶ 7.)  In January 2018, Plaintiff was reclassified from max custody and transferred to the ASPC-Eyman close custody Rynning unit.  (*Id*. at 4 ¶ 8; Doc. 128-2 at 5.)  At the Rynning Unit, there were no other Nation of Islam members, and there was no Nation of Islam literature in the unit's resource center, which is why Plaintiff decided to purchase his

1    own Nation of Islam literature.  (Doc. 128 at 4 ¶¶ 7–9.)  Plaintiff purchased four books by

2    Elijah Muhammad—*The Fall of America*, *Message to the Blackman in America*, and *The*

3    *Supreme Wisdom* (Volumes 1 and 2)—and one book by Akil titled *There are Only Two*

4    *Religions in the Whole World*.  (Doc. 122 ¶ 4; Doc. 122-1 at 15 ¶ 41; Doc. 64 at 5.)

5         Two of the books that Plaintiff ordered in 2018 had been previously excluded—

6    *Message to the Blackman in America* and *The Fall of America*.  (Doc. 122-1 at 15 ¶ 43.)

7    Years before Plaintiff ordered those books, they had been excluded initially at the complex

8    level and their exclusions were affirmed in second-level reviews by OPR after a different

9    prisoner requested the second-level reviews.  (*Id*. at 13-14 ¶¶ 35–37.)  Plaintiff's copies of

10   *Message to the Blackman in America* and *The Fall of America* arrived by mail at the prison

11   on March 20, 2018, and mailroom staff determined that the books had been excluded

12   previously and marked them as contraband.  (Doc. 122-1 at 204 ¶ 9.)  Defendant Slade

13   filled out the Inmate Property Contraband/Disposition Tracking form to withhold the two

14   books and informed Plaintiff that he would not receive the two books because they had

15   been excluded by the publication review staff at the complex level as contraband and had

16   previously been excluded.  (*Id*. ¶ 12.)  Plaintiff signed the contraband form on March 22,

17   2018, and Slade gave Plaintiff a copy of the contraband form and copies of the prior OPR

18   Notices of Result for *The Fall of America* dated 2/23/2015 and 7/6/2015 and *Message to*

19   *the Blackman In America* dated 3/28/2006, 5/11/2012 and 5/4/2017.  (*Id*. at 205 ¶ 14; Doc.

20   122-1 at 210, 212–13, 215–17.)

21        On March 23, 2018, Plaintiff appealed the decisions to exclude *The Fall of America*

22   and *Message to the Blackman In America*; on March 30, 2018, Plaintiff received Notices

23   of Result affirming the exclusions of the two books.  (Doc. 131 at 4 ¶ 7.)  One Notice of

24   Result is dated July 6, 2015 and states that *The Fall of America* was excluded for promoting

25   "[s]uperiority of one group over another/promotes racism/degradation."  (Doc. 128-7 at

26   18.)  The other Notice of Result is dated May 11, 2012 and states that *Message to the*

27   *Blackman in America* was excluded because it promotes "[s]uperiority of one group over

28   another/promotes racism/degradation."  (*Id*. at 20.)  Plaintiff also received an Inmate Letter

Response from Defendant Miller dated April 5, 2018 responding to Plaintiff's March 23, 2018 appeal, stating that "OPR performed a second review of *The Fall of America* on 07-06-2016 and concurred with the complex exclusion per DO 914.07 § 1.2.8.  OPR performed a second review of *Message to the Blackman in America* on 05-11-2012 and concurred with the complex exclusion per DO 914.07 § 1.2.8."  (Doc. 98 at 75.)  Miller concluded, "Per 914.08 § 1.2.2.5, OPR's decision is final.  Your letter seeking a review of OPR's decision is outside the policy.  Your letter, therefore, is inappropriate and your request will not be accommodated.  OPR considers this issue closed."  (*Id*.)

The other three books Plaintiff ordered––*There are Only Two Religions in the Whole World* and *The Supreme Wisdom* (Volumes 1 and 2)—had not been approved or excluded before Plaintiff ordered them.  (Doc. 122-1 at 15 ¶ 42.)  Plaintiff's copies of these three books arrived at the prison on May 10, 2018 and were excluded on May 21, 2018.  (*Id*. at 66 ¶ 36; Doc. 122-1 at 115.)  Plaintiff was notified on May 24, 2018 that his books were withheld by Defendant Mattson because they were unauthorized per DO 914.  (*Id*. at 67 ¶ 37.)  On May 24, 2018, Plaintiff submitted an Inmate Letter to Complex-Unit Publication Review Staff requesting a second-level review of the three excluded books.  (*Id*. 38; Doc. 122-1 at 119; Doc. 131 at 5 ¶ 11.)  On June 7, 2018, Complex Publication Review staff responded by memo, stating that the three books were excluded "due to containing material that is deemed unauthorized by" ADC and that Plaintiff would be notified of the results of the pending appeal.  (Doc. 128-7 at 22.)  On June 8, 2018, Plaintiff wrote a letter to Complex-Unit Publication Review Staff asking for a second-level review of *There are Only Two Religions in the Whole World* and *The Supreme Wisdom* (Volumes 1 and 2).  (Doc. 122-1 at 127.)  Defendant Mattson responded on July 6, 2018 that Plaintiff's request had already been processed.  (*Id*. at 129.)

Defendant Miller, an employee of the OPR at ADC's Central Office, reviewed the three books appealed by Plaintiff and concluded that they contained unauthorized content.  (Doc. 122-1 at 55, 69 ¶¶ 3, 46.)  Miller made a determination to affirm their exclusion.  (Doc. 121 ¶¶ 31, 33.)  Miller consulted with the ADC general counsel in making the

decision.  (*Id.* ¶ 34.)  On June 21, 2018, Miller upheld the complex decision to exclude all three publications in their entirety per "DO 914.07 1.2.8 as well as 1.1, 1.2.20 and DO 914.06 1.13," and Plaintiff was notified of the results.  (*Id*. at 147, 149, 151.)

According to Defendants, all five books ordered by Plaintiff were found to violate DO 914 based on "content that is oriented toward and/or promotes racism and/or religious oppression and the superiority of one race/religion/political group over another, and/or the degradation of one race/religion/political group by another."  (Doc. 122 ¶¶ 10, 11.)  For example, each book declared the white race to be "the devil," and each advocated for strict racial separation rather than integration.  (*Id.* ¶ 12.)  Defendants also presented excerpts from the books, including the following passages:

- "the whole Caucasian race is a race of devils" and "[t]he white race, by nature, can't be righteous."  (Doc. 122-1 at 70 ¶ 48 (quoting from *The Supreme Wisdom* (Vol. 1).)

- "I am doing all that I can to make the so-called Negroes see that the white race and their religion (Christianity) are their open enemies, and to prove to them that they will never be anything but the devils' slaves and finally go to help with them for believing and following them and their kind."  (*Id*. at 71 ¶ 49 (quoting from *The Supreme Wisdom* (Vol. 2).)

- "We all know that whitefolks is just plain whitefolks no matter what 'religious title' they may try to use as a shield to hide the spiritual hypocrisy of their actions" and that "this is only because they have historically proven to be enemies of righteousness."  (*Id*. at 72 ¶ 50 (quoting from *There are Only Two Religions*).)

- "God, Allah, has said the white race is a race of devils, created to be destroyed" and "To have love for them (white race) means the fire of hell that God has heated, is being heated up for both, you who loved the devil, and the devil too!"  (*Id*. at 73 ¶ 54 (quoting from *The Fall of America*).)

- "Allah has said to me that we are living in the end of the world of white rule, a race whom Allah has made manifest to you and me as the real devils" and "They [the white race] were not made to love or respect any member of the darker nations, for they are by nature, as Almighty Allah has taught me, incapable of loving even themselves."  (*Id*. at 74 ¶ 55 (quoting from *Message to the Blackman in America*).)

As to the individual Defendants, on May 11, 2012 (several years before the incidents at issue in this case), Defendant Reese upheld the exclusion of *Message to the Blackman in America* on a second-level review based on a prior second-level review of the same book in 2006. (Doc. 122 ¶ 24.) Reese did not independently review the book at OPR in 2012 but did confirm that its content was the same as a prior version of the books that was excluded on appeal in 2006. (*Id.* ¶ 38.) Reese had no responsibilities with the OPR after 2012 and was not involved in the exclusion of Plaintiff's book in 2018. (*Id.* ¶¶ 24, 25.)

Defendant Olson retired from ADC in May 2016, but on July 6, 2015, Olson did issue a Notice of Result-Publication Review upholding the exclusion of *The Fall of America*, presumably for another prisoner, not Plaintiff. (Doc. 122 ¶¶ 22, 23.)

Defendant Slade was not involved in the decisions to exclude or allow publications, but Slade did inform Plaintiff of decisions made by other ADC employees to exclude *The Fall of America* and *Message to the Blackman in America*. (*Id.* ¶ 21; Doc. 131 at 4 ¶ 5.)

*Message to the Blackman in America* was published in 1965 and *The Fall of America* was published in 1973. (Doc. 128 at 4 ¶ 13.) *Message to the Blackman in America* was not excluded until May 11, 2012—47 years after its publication. (*Id.* ¶¶ 14, 15.) *The Fall of America* was not excluded until July 6, 2015—43 years after its publication. (*Id.* ¶ 16.) Plaintiff asserts that he was denied a second-level review of the exclusion of these two books. (*Id.* ¶ 18.)

The only form of religious expression Plaintiff is allowed is access to a Qur'an, a Bible, individual prayer in his cell, and fasting during Ramadan, but he does not have the "essential books to teach him how to pray" or the ability to receive religious instructions.[3] (Doc. 128 at 5 ¶ 19.) There is a complete ban on essential Nation of Islam texts including its newspaper, "The Final Call." (*Id.* ¶ 21.) While the religious texts may refer to the white race as devils, they do not advocate violence, call for the disruption of the prison or government, and do not call for followers to take up arms. (*Id.* at 6 ¶ 23.)

---

[3] Plaintiff is presumably referring to what is allowed in his current housing/classification status since he said he previously had access to Nation of Islam materials before he was reclassified.

1    According to Defendants, Plaintiff can read other books, watch TV, listen to the
2    radio, converse with other prisoners, staff, and visitors, and correspond freely via the mail.
3    (Doc. 122 ¶ 26.)  Plaintiff "can also pray, read religious texts that comply with policy,
4    congregate for periodic religious ceremonies, and perform the range of acceptable religious
5    practices outlined in DO 904–3.0."  (*Id.* ¶ 27.)  Plaintiff states that he has been in max
6    custody since April 25, 2018 and therefore cannot congregate for religious ceremonies and
7    is unable to practice his religious beliefs using other religious books that are not from the
8    Nation of Islam.  (Doc. 131 at 10 ¶ 18.)  Plaintiff does not follow the teachings of non-
9    Nation of Islam authors and he "cannot watch his belief system on the TV or hear it on the
10   radio."  (*Id.*)

11   **V.     Discussion**

12       **A.     RLUIPA**

13           **1.     Legal Standard**

14   Under RLUIPA, a government may not impose a substantial burden on the religious
15   exercise of a confined person unless the government establishes that the burden furthers a
16   "compelling governmental interest" and does so by "the least restrictive means." 42 U.S.C.
17   § 2000cc-1(a)(1)-(2); *Warsoldier v. Woodford*, 418 F.3d 989, 994 (9th Cir. 2005).  To
18   prevail on a RLUIPA claim, the plaintiff bears the initial burden of establishing that his
19   religious exercise has been substantially burdened.  *Warsoldier*, 418 F.3d at 994 (citing 42
20   U.S.C. § 2000cc-2(b)).  The government then bears the burden of proving that the
21   substantial burden on the prisoner's religious practice both furthers a compelling
22   governmental interest and is the least restrictive means of doing so.  *Id.* at 995 (citing 42
23   U.S.C. §§ 2000cc-1(a), 2000cc-2(b)).

24           **2.     Analysis**

25   A substantial burden exists where the state "put[s] substantial pressure on an
26   adherent to modify his behavior and to violate his beliefs." *Thomas v. Review Bd. of the*
27   *Ind. Employment Sec. Div.*, 450 U.S. 707, 717-18 (1981).  "A substantial burden must be

28

1   more than an inconvenience." *Worldwide Church of God v. Philadelphia Church of God*,

2   227 F.3d 1110, 1121 (9th Cir. 2000) (internal quotes and citations omitted).

3          Defendants argue that Plaintiff cannot show his religious practice was substantially

4   burdened by not receiving the five books at issue because he had access to "innumerable"

5   other religious texts, he could have purchased books that comply with ADC policy, he

6   could engage in prayer and fasting, and was "free to attend religious services as available."

7   (Doc. 121 at 9.)

8          Plaintiff does not specifically address the substantial burden issue, and his Response

9   does not demonstrate that the denial of these five books is a substantial burden.  Plaintiff

10  does not present evidence that he must have these particular five books in order to practice

11  his religion.  In fact, Plaintiff states that texts and literature by Elijah Muhammad and Louis

12  Farrakhan are essential religious texts he needs to practice his faith, but one of the excluded

13  books is by Akil, and Plaintiff does not say that texts by Akil are essential to his practice.

14  And, while Plaintiff states that he does not have the "essential books to teach him how to

15  pray," he has not presented evidence that the five excluded books are the only essential

16  books that can teach him how to pray, that these are the only books by Elijah Muhammad

17  and Louis Farrakhan, that all books from the Nation of Islam essential to his practice are

18  prohibited by ADC, or that he is unable to purchase Nation of Islam books that are

19  permitted by ADC.

20         Because Plaintiff has not shown that a prison policy or practice places a substantial

21  burden on his religious beliefs, Plaintiff's RLUIPA claim fails.  The Court need not

22  consider whether the policy furthers a compelling government interest or is the least

23  restrictive means of doing so.  Defendant's motion for summary judgment with respect to

24  Plaintiff's RLUIPA claims in Count One, Two and Three is granted.

**B.     First Amendment Free Exercise**

**1.     Legal Standard**

27         "Inmates retain the protections afforded by the First Amendment, 'including its

28  directive that no law shall prohibit the free exercise of religion.'"  *Shakur v. Schriro*, 514

F.3d 878, 883-84 (9th Cir. 2008) (quoting *O'Lone v. Estate of Shabazz*, 482 U.S. 342, 348 (1987)).  To implicate the Free Exercise Clause, a prisoner must show that the belief at issue is both "sincerely held" and "rooted in religious belief."  *Malik v. Brown*, 16 F.3d 330, 333 (9th Cir. 1994); *see Shakur*, 514 F.3d 884-85 (noting the Supreme Court's disapproval of the centrality test and finding that the sincerity test in *Malik* determines whether the Free Exercise Clause applies).  If the prisoner makes this initial showing, he must then establish that prison officials substantially burden the practice of his religion by preventing him from engaging in conduct which he sincerely believes is consistent with his faith.  *Shakur*, 514 F.3d at 884-85.

A regulation that burdens the First Amendment right to free exercise may be upheld only if it is reasonably related to a legitimate penological interest.  *Turner v. Safley*, 482 U.S. 78, 89 (1987).  This determination requires analysis of four prongs: (1) whether there is a valid, rational connection between the regulation and the legitimate governmental interest; (2) whether there are alternative means of exercising the right that remain open to inmates; (3) the impact accommodation of the right will have on guards and other inmates, and on the allocation of prison resources; and (4) the absence of ready alternatives.  *Id.* at 90.  The "existence of obvious, easy alternatives" to the regulation indicate that it "is an exaggerated response to prison concerns."  *Id*. (citation and quotation omitted).

### 2.    Analysis

Defendants do not dispute that Plaintiff's religious beliefs are sincerely held.  Therefore, the Court's analysis turns to whether Defendants have substantially burdened the practice of his religion.  The Court has already determined that Plaintiff has not demonstrated a genuine dispute with respect to whether the exclusion of the five books substantially burdens the exercise of Plaintiff's religion. *See Sprouse v. Ryan*, 346 F. Supp. 3d 1347, 1357 (D. Ariz. 2017) ("The RLUIPA substantial-burden test is the same as that used under the First Amendment.").  Because Plaintiff has not met his burden, summary judgment will be granted as to Plaintiff's First Amendment free exercise claims in Counts

1 through 8 and the Court need not consider whether the regulation is reasonably related to a legitimate penological interest.

### C.    First Amendment Free Speech

#### 1.    Legal Standard

A prisoner retains First Amendment rights not inconsistent with his status as a prisoner and with legitimate penological objectives of the corrections system. *See Shaw v. Murphy*, 532 U.S. 223, 231 (2001); *Clement v. California Dep't of Corrs.,* 364 F.3d 1148, 1151 (9th Cir. 2004). Thus, a prisoner has a First Amendment right to receive mail; however, that "right is subject to substantial limitations and restrictions in order to allow prison officials to achieve legitimate correctional goals and maintain institutional security." *Prison Legal News v. Lehman*, 397 F.3d 692, 699 (9th Cir. 2005) (citations and quotations omitted). Jails and prisons may regulate the processing of prisoner mail so long as those regulations further an important or substantial government interest other than the suppression of expression. *See Procunier v. Martinez*, 416 U.S. 396, 411-12 (1974), *overruled on other grounds, Thornburgh v. Abbott*, 490 U.S. 401, 412-414 (1989)); *Valdez v. Rosenbaum*, 302 F.3d 1039, 1048 (9th Cir. 2002) (jail personnel may regulate speech if a restriction is reasonably related to legitimate penological interests and a prisoner is not deprived of all means of expression). "Prevention of criminal activity and the maintenance of prison security are legitimate penological interests which justify the regulation of both incoming and outgoing prisoner mail." *O'Keefe v. Van Boening*, 82 F.3d 322, 326 (9th Cir. 1996). In addition, the Supreme Court recognizes that there are greater security concerns for incoming mail than for outgoing mail. *Thornburgh*, 490 U.S. at 413.

Like free exercise claims, free expression claims are analyzed under *Turner's* four-factor test. *Turner* is a deferential standard and courts must give "substantial deference to the professional judgment of prison administrators." *Beard v. Bank*, 548 U.S. 521, 528 (2006) (quoting *Overton v. Bazzetta*, 539 U.S. 126, 132 (2003)). A court does not have to agree with the officials' proffered legitimate penological interest. *Frost v. Symington*, 197 F.3d 348, 355 (9th Cir. 1999). The inquiry under *Turner* is not whether the policy actually

1   serves a penological interest, but rather whether it was rational for jail officials to believe

2   that it would. *Mauro v. Arpaio*, 188 F.3d 1054, 1060 (9th Cir. 1999) ("prison officials need

3   not prove that the banned material actually caused problems in the past, or that the materials

4   are 'likely' to cause problems in the future") (quoting *Thornburgh*, 490 U.S. at 417).

5           **2.     *Turner* Analysis**[4]

6                   **a.     Rational Connection to Legitimate Governmental Interest**

7           The Court must first determine whether the governmental objective underlying DO

8   914.07's exclusion of "[c]ontent that is oriented toward and/or promotes racism and/or

9   religious oppression and the superiority of one race/religion/political group over another,

10  and/or the degradation of one race/religion/political group by another" is (1) legitimate,

11  (2) neutral, and (3) whether the policy is rationally related to its objective. *Thornburgh*,

12  490 U.S. at 414.  "In the prison context, regulations that apply to specific types of content

13  due to specific inherent risks or harms are considered to be content neutral. *Bahrampour*

14  *v. Lampert*, 356 F.3d 969, 975 (9th Cir. 2004).   In *Thornburgh*, the Supreme Court

15  explained that:

16              [P]rison officials may well conclude that certain proposed
                interactions, though seemingly innocuous to laymen, have
17              potentially significant implications for the order and security
                of the prison.  Acknowledging the expertise of these officials
18              and that the judiciary is 'ill equipped' to deal with the difficult
                and delicate problems of prison management, this Court has
19              afforded considerable deference to the determinations of prison
                administrators who, in the interest of security, regulate the
20              relations between prisoners and the outside world.
21

22  490 U.S. at 408 (citation omitted).

23          Here, the stated purpose of DO 914.07 is to "assist with rehabilitation and treatment

24  objectives . . . and prevent a hostile environment for inmates, staff and volunteers . . . ."

25  (Doc. 122-1 at 36.)  Defendants present evidence of the content they believe violates DO

26  914.07 § 7.2.8, including excerpts stating "the whole Caucasian race is a race of devils,"

27  _____

28          [4] While both parties set forth the *Turner* legal standard in their briefs, they do not
    apply each element of the test of the facts presented.

"the white race and their religion (Christianity) are their open enemies" (*The Supreme Wisdom* (Vol. 2)), "[whitefolks] have historically proven to be enemies of righteousness" (*There are Only Two Religions*), "the white race is a race of devils, created to be destroyed" (*The Fall of America*), "[t]he white race, by nature, can't be righteous" (*The Supreme Wisdom* (Vol. 1)), and "Allah has said to me that we are living in the end of the world of white rule, a race whom Allah has made manifest to you and me as the real devils" (*Message to the Blackman*).  (*Id.* at 70 ¶¶ 48–50, 54–55.)

Defendants also present evidence that racial tension and violence are problems in the ADC system, that Security Threat Groups often collate in racial groups, that prison riots often stem from racial tension, that perceptions of racism or beliefs of racial superiority can lead to violence and disorder, and that ADC strives to achieve racial integration in cells and dorms and to combat racial segregation.  (Doc. 122 ¶¶ 17–20.) These are legitimate penological interests.  *Mauro*, 188 F.3d at 1059 (jail security and rehabilitation are legitimate penological interests).  Further, the policy is neutral on its face—there is nothing to indicate that the aim of the policy is to suppress expression. *Thornburgh*, 490 U.S. at 415-16 ("the regulation or practice in question must further an important or substantial government interest unrelated to the suppression of expression"). Finally, "[t]o show a rational relationship between a regulation and a legitimate penological interest, prison officials need not prove that the banned material actually caused problems in the past, or that the materials are 'likely' to cause problems in the future."  *Mauro*, 188 F.3d at 1060 (citation omitted).  As long as officials "might reasonably have thought that the policy would advance its interests[,]" the *Turner* standard is met.  *Id.*  Here, the rational relationship between DO 914.07 and the objectives sought to be addressed by the policy— security, the avoidance of a hostile environment for prisoners, staff and volunteers, and integration—is not so "'remote as to render the policy arbitrary or irrational.'"  *Mauro*, 188 F.3d at 1060 (citing *Turner*, 482 U.S. at 89-90) (other citations omitted).

Plaintiff has not refuted Defendants' evidence regarding DO 914.07.  On this record, the first factor of the *Turner* analysis weighs in Defendants' favor.

### b.   Alternative Means of Exercising Right at Issue

The second *Turner* factor considers "whether there are alternative means of exercising the right that remain open to prison inmates." *Turner*, 482 U.S. at 90. "Where other avenues remain available for the exercise of the asserted right, courts should be particularly conscious of the measure of judicial deference owed to corrections officials . . . in gauging the validity of the regulation." *Id.* (internal quotations and citations omitted). When analyzing the second *Turner* factor, the Court must view the right in question "sensibly and expansively." *Thornburgh*, 490 U.S. at 417 (citation omitted).

Applying this standard, the right at issue here is the right to receive Nation of Islam literature that offers instruction in prayer and other religious practices and teachings. Defendants present evidence that Plaintiff has alternatives to the books he ordered including praying, reading religious text that comply with policy, congregating for periodic religious ceremonies, and performing the range of acceptable religious practices outlined in DO 904–3.0. (Doc. 122 ¶ 27.) Defendants present evidence that other Islamic religious texts are allowed such as the Holy Qur'an; Lessons on Islamic Doctrine; Know Your Islam; Islamic Teachings; Islam Top 50 Questions; The Third Jihad: Overcoming Radical Islam's Plan for the West; Islamic Dietary Concepts & Practices; and Muhammad in the Mirror of Islam.[5] (Doc. 122-1 at 75-76 ¶ 56.) Miller states in her Declaration that Plaintiff was and is free to purchase and read any of these texts "and innumerable others that do not violate ADC[] policy."[6] (*Id.* ¶ 57.) Plaintiff counters that in max custody he is only allowed is access to a Qur'an, a Bible, individual prayer in his cell, and fasting during Ramadan, but he does not have the "essential books to teach him how to pray" or the ability to receive religious instructions. (Doc. 128 at 5 ¶ 19.) Plaintiff also presents evidence that while he is in max custody he cannot congregate for religious ceremonies and he cannot practice his

---

[5] Miller does not say who the authors are of those texts or whether any of them pertain to the Nation of Islam.

[6] Defendants also present evidence that Plaintiff could read other books, watch TV, listen to the radio, converse with other prisoners, staff and visitors, and correspond via mail, but Defendants do not present any evidence as to how those activities, most of which appear secular, would support Plaintiff's ability to practice his religion.

1  religious beliefs using other religious books that are not from the Nation of Islam because

2  Plaintiff does not follow the teachings of non-Nation of Islam authors and there is no

3  Nation of Islam literature in his unit's resource center.  (Doc. 131 at 10 ¶ 18.)

4        Based on this record, there is a genuine issue of material fact whether Plaintiff has

5  sufficient alternative means to practice his religion.  Accordingly, this second *Turner* factor

6  weighs in Plaintiff's favor.

7                      c.      **Adverse Impacts of Accommodation**

8        Third, the Court must consider the impact on the prison and other prisoners if

9  prisoners were allowed to receive publications that contain prohibited material or content.

10  *Turner*, 482 U.S. at 90.  "If accommodations for a constitutional right would cause

11  significant changes within the prison environment, the courts should give deference to the

12  prison officials who are responsible for safe, effective, and efficient administration of the

13  prison system."  *Bahrampour*, 356 F.3d at 975.

14        Defendants argue that deviating from DO 914.07 "would have severe detrimental

15  effects on staff and other prisoners," that if ADC provides exemptions to Plaintiff "the

16  ripple effect would be harsh," and that ADC's rehabilitative interests would be undermined

17  because the material Plaintiff seeks "is pervasively racist and contrary to the interest of the

18  department in discouraging such beliefs among its inmate population."[7]  (Doc. 121 at 8.)

19  Defendants also assert that allowing the publications "would incite racial violence, thwart

20  the ADC[]'s efforts at racial integration, and undermine the safe and secure operation of a

21  prison system that houses some 40,000 inmates."  (*Id.*, citing Doc. 122 ¶¶ 3, 15-20.)  While

22  Defendants do not present evidence that these problems have occurred in the past, that is

23  not the standard under *Turner*, but rather whether prison officials reasonably believed these

24  problems could occur.  *Mauro*, 188 F.3d at 1060.  While Plaintiff asserts that the books he

25  ordered do not advocate violence, it was reasonable for prison officials to believe they

26

27  _____

28        [7] Defendants have only presented a few excerpts from the texts and do not present
evidence that the texts are "pervasively" racist or how they define "racist."

1    could lead to violence and thwart ADC's efforts at integration.  Accordingly, this third

2    *Turner* factor weighs in Defendants' favor.

3                          **d.    Obvious Alternatives**

4          Finally, the Court examines whether the policy at issue is an exaggerated response

5    to the prison's concerns.  *Turner*, 482 U.S. at 90.  On this prong, Plaintiff bears the burden

6    of showing that there are obvious, easy alternatives to the regulation.  *Mauro*, 188 F.3d at

7    1062.  If Plaintiff can identify an alternative that fully accommodates the right at a de

8    minimis cost to valid penological goals, the policy is an exaggerated response.  *Turner*,

9    482 U.S. at 90-91.  "If there are no obvious alternatives, and if the inmate only presents

10   solutions that will negatively impact valid penological interests, then courts will view the

11   absence of ready alternatives as evidence of a reasonable regulation."  *Bahrampour*, 356

12   F.3d at 976.

13         Defendants argue that there is no easy, obvious alternative to DO 914 because ADC

14   "requires the precision and consistency of DO 914 to ensure equal application throughout

15   its many and varied prisons" and that past incidents of racial violence "merely confirms

16   the wisdom of implementing the policy consistently and diligently throughout the state."

17   (Doc. 121 at 8-9.)  Plaintiff does not make any argument as to this fourth factor and has

18   therefore not met his burden of identifying obvious, easy alternatives to the regulation.

19   Accordingly, this fourth factor weighs in Defendants' favor.

20         Of the four *Turner* factors, only one−whether Plaintiff has other means to receive

21   Nation of Islam literature that offers instruction in prayer and other religious practices and

22   teachings−presents a question of fact in favor of Plaintiff, and the remaining *Turner* factors

23   all favor Defendants.  While the Court must infer in Plaintiff's favor that, as a max custody

24   prisoner, Plaintiff has no access to Nation of Islam texts other than the Qur'an and is not

25   permitted to practice his religion with other Nation of Islam prisoners, these facts do not

26   create a question of fact that DO 914.07 violates Plaintiff's First Amendment freedom of

27   expression.  Even if these custody-related restrictions separately infringe on Plaintiff's

28   exercise of his right to receive Nation of Islam literature that offers instruction in prayer

and other religious practices and teachings, Plaintiff has not shown that they are tied to DO 914.07.  Instead, they are allegedly a result of Plaintiff's custody status, apart from which Defendants have made a sufficient showing that Plaintiff would have access to Nation of Islam texts and religious expression that are not prohibited under DO 914.07.  Additionally, because all remaining *Turner* factors weigh in Defendants' favor, there is no question of fact whether DO 914.07 violates the First Amendment, and the Court will grant summary judgment to Defendants on Plaintiff's First Amendment free speech claims in Counts 1 through 8.

### 3.     Qualified Immunity

Alternatively, even if there were a question of fact, the Court must consider whether Defendants are entitled to qualified immunity as to Plaintiff's First Amendment claim. Government officials are entitled to qualified immunity from civil damages unless their conduct violates "clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).  Officials are not entitled to qualified immunity if "(1) they violated a federal statutory or constitutional right, and (2) the unlawfulness of their conduct was 'clearly established at the time.'" *District of Columbia v. Wesby,* — U.S. —, 138 S. Ct. 577, 589 (2018) (quoting *Reichle v. Howards,* 566 U.S. 658, 664, (2012)).  Courts may address either prong first, depending on the circumstances in the particular case. *Pearson v. Callahan*, 555 U.S. 223, 230–32, 235-36 (2009).

For a right to be clearly established there does not have to be a case directly on point; however, "'existing precedent must have placed the statutory or constitutional question beyond debate.'" *White v. Pauly,* — U.S. —, 137 S. Ct. 548, 551 (2017) (quoting *Mullenix v. Luna,* — U.S. —, 136 S. Ct. 305, 308 (2017)).  Accordingly, a right is clearly established when case law has been "earlier developed in such a concrete and factually defined context to make it obvious to all reasonable government actors, in the defendant's place, that what he is doing violates federal law." *Shafer v. Cnty. of Santa Barbara*, 868 F.3d 1110, 1117 (9th Cir. 2017) (citing *White*, 137 S. Ct. at 551).  To determine whether

1    qualified immunity applies, the court must first identify the federal or constitutional right
2    at issue; then it must attempt to "identify a case where an officer acting under similar
3    circumstances as [the defendant] was held to have violated" that right.  *Id.*  If there is no
4    such case, then the right was not clearly established, and the officer is protected from suit.
5    *See id.* at 1117-18.  The plaintiff has the burden to show that the right was clearly
6    established at the time of the alleged violation under the second prong of the analysis.
7    *Sorrels v. McKee*, 290 F.3d 965, 969 (9th Cir. 2002).

8            Defendants argue that existing precedent confirms that their actions were lawful.
9    (Doc. 121 at 14-15.)  Defendants cite *Thornburgh*, which determined that it was rational
10   for the Bureau of Prisons to exclude materials that "although not necessarily 'likely' to lead
11   to violence, are determined by the warden to create an intolerable risk of disorder under
12   the conditions of a particular prison at a particular time."  490 U.S. at 417.  Defendants also
13   cite *Stefanow v. McFadden*, in which the Ninth Circuit upheld the exclusion of a book that
14   a prisoner sought for religious reasons which promoted white supremacy, described the
15   "Number One" motive of Jews as the "destruction of White Christian civilization," and
16   pleaded for white Christians to "'start by preparing the groundwork for battle' between
17   Judaism and Christianity."   103 F.3d 1466, 1469 (9th Cir. 1996), *superseded on other
18   grounds by Navajo Nation v. U.S. Forest Serv.*, 479 F.3d 1024 (9th Cir. 2007).

19           Plaintiff's Response only provides a qualified immunity legal standard but does not
20   cite to a case in which the right to possess religious texts that prison officials deemed a
21   threat to prison order and security was clearly established.  Elsewhere in his briefing,
22   Plaintiff frequently cites a Third Circuit case, *Sutton v. Rasheed*, 323 F.3d 236 (3d Cir.
23   2003).  In *Sutton*, the court held that a prison policy limiting restrictive status prisoners to
24   a Bible, Qur'an or "other religious equivalent," and not permitting them to have other
25   Nation of Islam texts (among them, *Message to the Blackman in America*) violated the
26   plaintiffs' First Amendment rights.  The court took particular note of prison officials'
27   determination that the texts were "not religious" in nature and that the plaintiffs' expert
28   presented uncontradicted testimony that the books that were denied were "essential

religious texts of the Nation of Islam," were "required reading by the faithful," and that without them "a person could not function well in the Nation of Islam's religious community." *Id*. at 254-255.  Based on this evidence, the Court found that all four *Turner* factors favored the plaintiffs.  *Id*. at 256.  Nevertheless, the Court determined that the defendants were entitled to qualified immunity because it was "questionable whether the likely invalidity of the application of the Department of Corrections' SMU policy was clearly established so that it should have been apparent to defendants," especially since the first and second prongs of the *Turner* analysis presented "close calls" and "in light of the great deference we accord the judgments of prison officials."  *Id*. at 260.

The Court finds *Sutton* inapplicable in this case because Defendants in this case did not determine that the texts at issue were not religious in nature but rather that they threatened institutional order and security.  Moreover, even *Sutton* found that the defendants were entitled to qualified immunity.  Likewise, here, Defendants are entitled to qualified immunity because Plaintiff has not pointed to, and the Court is unaware of, cases that have clearly established the unlawfulness of Defendants' conduct in prohibiting religious texts that promote racial superiority and which prison officials have deemed a threat to order and security.

### D.    Due Process Claims

#### 1.    Legal Standard

Prisoners have a liberty interest in sending and receiving mail, and therefore they are entitled to some procedural due process when they are deprived of that mail.  *See Krug v. Lutz*, 329 F.3d 692, 696–97 (9th Cir. 2003) (prisoner "has a liberty interest in the receipt of his subscription mailings sufficient to trigger procedural due process guarantees."); *Procunier v. Martinez*, 416 US. 396, 418–19 (1974) ("The interest of prisoners and their correspondents in uncensored communication by letter, grounded as it is in the First Amendment, is plainly a 'liberty' interest within the meaning of the Fourteenth Amendment even though qualified of necessity by the circumstance of imprisonment [and] is protected from arbitrary governmental invasion."), *overruled on other grounds by*

1    *Thornburgh*, 490 U.S. 401.   Generally, when seizing a prisoner's mail, three baseline

2    protections must be afforded: (1) notice to the prisoner of the rejection, (2) a reasonable

3    opportunity to appeal the rejection, and (3) review by an independent official.  *See*

4    *Martinez*, 416 U.S. at 418-19; *Krug*, 329 F.3d at 697 (independent, 2-level review); *Frost*,

5    197 F.3d at 353.

6                          **2.      Analysis**

7            Here, it is undisputed, and the record shows, that Plaintiff was given notice of the

8    rejected publications.  Plaintiff signed the contraband form for *Message to the Blackman*

9    *in America* and *The Fall of America* on March 22, 2018, and Slade gave Plaintiff a copy of

10   the contraband form and copies of the prior OPR Notices of Result for *The Fall of America*

11   dated 2/23/2015 and 7/6/2015 and *Message to the Blackman In America* dated 3/28/2006,

12   5/11/2012 and 5/4/2017.  (Doc. 122-1 at 205 ¶ 14.)  Plaintiff appealed the decisions to

13   exclude *The Fall of America* and *Message to the Blackman In America*; on March 30, 2018,

14   and Plaintiff received Notices of Result affirming the exclusions of the two books, which

15   included the July 6, 2015 Notice of Result by Olson excluding *The Fall of America* and the

16   May 11, 2012 Notice of Result by Reese excluding *Message to the Blackman in America*.

17   (Doc. 131 at 4 ¶ 7.)  Plaintiff also received a response to his March 28, 2018 appeal from

18   Defendant Miller, which is dated April 5, 2018, stating that "OPR performed a second

19   review of *The Fall of America* on 07-06-2016 and concurred with the complex exclusion

20   per DO 914.07 § 1.2.8.  OPR performed a second review of *Message to the Blackman in*

21   *America* on 05-11-2012 and concurred with the complex exclusion per DO 914.07 § 1.2.8."

22   (Doc. 98 at 75.)

23          It is also undisputed that Plaintiff was notified on May 24, 2018 that *There are Only*

24   *Two Religions in the Whole World* and *The Supreme Wisdom* (Volumes 1 and 2) were

25   withheld by Defendant Mattson because they were unauthorized per DO 914.  (Doc. 122-

26   1 at 119, 127.)  Plaintiff appealed the exclusion of the three books, and Defendant Miller

27   reviewed the three books appealed by Plaintiff and concluded that they contained

28

unauthorized content under DO 914.07 and upheld their exclusion. (Doc. 122-1 at 69 ¶¶ 3, 46; Doc. 122-1 at 147,149, 151.)

Thus, Plaintiff received notices of the exclusion of each of the books at the prison complex level and he appealed those exclusions to the highest administrative level. Those appeals resulted in independent reviews by ADC officials. Accordingly, the record shows that the basic requirements of due process were met with respect to the excluded books at issue and the Court will grant summary judgment to Defendants as to Plaintiff's due process claim in Counts 4, 5, 6 and 8.[8]

**IT IS ORDERED:**

(1)    The reference to the Magistrate Judge is withdrawn as to Defendants' Motion for Summary Judgment (Doc. 121).

(2)    The individual-capacity RLUIPA claims against Defendants Lauchner and Miller are dismissed.

(3)    Defendants' Motion for Summary Judgment (Doc. 121) is **granted**, and the action is terminated with prejudice. The Clerk of Court must enter judgment accordingly.

Dated this 15th day of July, 2020.

*Michael T. Liburdi*

Michael T. Liburdi
United States District Judge

---

[8] Because the Court is granting summary judgment to Defendants on the merits of Plaintiff's due process claim, the Court will not address Defendants' qualified immunity argument as to Plaintiff's due process claim.